IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS,

K.J.A.,1

        Plaintiff,

    Vs.                          No. 20-1281-SAC

KILOLO KRJAKAZI,
Acting Commissioner of Social Security2,

        Defendant.


MEMORANDUM AND ORDER

      This is an action reviewing the final decision of the defendant Commissioner of Social Security ("Commissioner") that denied the claimant K.J.A.'s Title II application for disability insurance benefits which alleged an onset date of November 9, 2017. ECF# 14, p. 247. Among the physical and mental conditions listed as limiting K.J.A.'s ability to work were ankle problem, anxiety, asthma, hip problem, rheumatoid arthritis, migraines, gastroesophageal reflux disorder, depression, post-traumatic stress disorder ("PTSD"), dementia, and conversion disorder. *Id*. at p. 251. The application was denied, initially and on reconsideration, and a hearing before an

---

1 The use of initials is to preserve privacy interests.
2 On July 9, 2021, Kilolo Krjakazi was named acting Commissioner of Social Security replacing Andrew M. Saul.

1

administrative law judge ("ALJ") ended with a denial of benefits. The Appeals Council denied a request for review, so the ALJ's decision stands as the Commissioner's final decision. The case comes before the court on the claimant's request for a reversal and remand for further administrative proceedings. The case is ripe for judicial review.

**STANDARD OF REVIEW**

To qualify for disability benefits, a claimant must establish that he or she was "disabled" under the Social Security Act, 42 U.S.C. § 423(a)(1)(E), during the time when the claimant had "insured status" under the Social Security program. *See Potter v. Secretary of Health & Human Services*, 905 F.2d 1346, 1347 (10th Cir. 1990); 20 C.F.R. §§ 404.130, 404.131. Disability is defined as unable "to engage in any substantial gainful activity by reasons of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). And, "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, . . ., engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A). The

Commissioner is to make this severity determination by considering "the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that the Commissioner's finding "as to any fact, if supported by substantial evidence, shall be conclusive." The Supreme Court recently summarized the relevant holdings behind this standard:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." *Ibid*.; *see, e.g., Perales*, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison*, 305 U.S. at 229, 59 S.Ct. 206. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

*Biestak v. Berryhill*, ---U.S.---, 139 S.Ct. 1148, 1154 (2019). In using this standard, a court examines the whole record, including whatever in the record fairly detracts from the weight of the Commissioner's decision, and decides whether substantial evidence supports the decision. *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994). A court, however, may not

reverse the Commissioner's choice between two reasonable but conflicting views, even if the court would have chosen differently assuming a *de novo* review. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citation omitted). The court reviews "only the sufficiency of the evidence, not its weight." *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007). A court, however, is not to affirm findings by isolating facts and labeling them as substantial evidence, but rather it scrutinizes the entire record to assess the rationality of the Commissioner's decision. *Graham v. Sullivan*, 794 F. Supp. 1045, 1047 (D. Kan. 1992).

**ALJ's DECISION**

The ALJ employed the following five-step sequential evaluation process (20 C.F.R. § 404.1520) for determining a disability application. ECF# 14, p. 18. First, it is determined whether the claimant is engaging in substantial gainful activity. Second, the ALJ decides whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments which are "severe." At step three, the ALJ decides whether the claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ at step four determines the claimant's residual functional capacity ("RFC") and then decides whether the claimant has the

RFC to perform the requirements of his or her past relevant work. The last step has the ALJ determine whether the claimant is able to do any other work considering his or her RFC, age, education and work experience. For steps one through four, the burden rests with the claimant to prove a disability that prevents performance of past relevant work, but the burden shifts to the Commissioner at step five. *Blea v. Barnhart*, 466 F.3d 903, 907 (10th Cir. 2006).

In her decision, the ALJ found for step one that the "claimant has not engaged in substantial gainful activity since November 9, 2017, the alleged onset date." ECF# 14, p. 19. For step two, the ALJ found the claimant's severe impairments were "fibromyalgia, arthritis, obesity, epilepsy, asthma, anxiety, post-traumatic stress disorder (PTSD), depressive disorder, and conversion disorder," because they "significantly limit the ability to perform basic work activities." *Id.* at 20. At step three, the ALJ found that the "claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." *Id.* at 20. The ALJ determined at step four that the claimant had the RFC to perform light work in that she "can lift and carry 20 pounds occasionally and 10 pounds frequently," "can sit for six hours or more in an eight-hour day," "has the ability to focus and persist at one or two step tasks

for an eight-hour day, but would have difficulty with more complex and detailed tasks, particularly those requiring sustained concentration for more than two hours without a break," can occasionally interact with others, and "can adjust to routine changes in a simple work environment if introduced gradually." *Id.* at 22. The ALJ determined there were significant numbers of light work jobs which could be performed by claimant considering her age, education, work experience, and RFC. *Id.* at 26. Consequently, the ALJ found that the plaintiff was not disabled.

**ARGUMENT AND ANALYSIS OF EVIDENCE**

The claimant generally attacks the ALJ's RFC finding as unsupported by substantial evidence, because it fails to address and weigh properly the medical opinion evidence of record. The claimant focuses on the ALJ's lack of a reasonably sufficient rationale for finding the opinion of her treating physician, Dr. Webb, not persuasive while finding the opinions of the state agency consultants persuasive when they are not consistent with other medical evidence.

Before taking up the claimant's arguments, the court will summarize the relevant medical records. The claimant's primary treating physician is Dr. Webb who in May of 2017, saw her for fibromyalgia, conversion disorder, pseudoseizures, and asthma. She complained of

6

passing out in stressful situations as witnessed by family members. Dr. Webb noted that the results of a neurological examination in Wichita showed the seizures were likely related to her conversion disorder. She was encouraged to keep up counseling and relaxation techniques for the seizures. In June, she returned with complaints about several more "syncopal-like episodes" and more pain related to her fibromyalgia. *Id*. at 363. Additional tests were ordered, and a referral to a rheumatologist was made. In July of 2017, Dr. Webb saw claimant on complaints of increased fatigue from fibromyalgia, and all medications were continued with a recommendation for increased activity. At her follow-up examination in October, she complained of "increased memory loss secondary to dementia." *Id.* at 619. In January of 2018, after having been hospitalized for burns from passing out in the shower from a seizure, claimant went to Dr. Webb's office and was seen by Christina Armstrong, PA, who recommended weekly counseling, including more frequent psychiatric visits. A week later, claimant again was seen with various physical and mental complaints, and her mood was noted as depressed and affect was flat. *Id.* at 606.

On Christmas eve evening of 2017, the claimant was treated at the Hoisington Hospital for burns to her face, scalp, and neck with blisters on ears and neck from passing out during a syncopal episode in the shower.

Treatment notes said the claimant could only remember turning on the shower sprayer nozzle. Claimant's husband told the hospital that he was about to leave the house when he heard his wife screaming and things falling. When he finally was able to get inside the locked bathroom, he found her screaming in the bathtub and trying to wrap a towel around herself. The nurse's progress notes also include, "Patient and her husband both report she has had episodes of syncope in the past, and that this is not unusual for her. She reports she has conversion disorder and stress-induced pseudoseizures." *Id.* at 386. Notes indicate it was unclear how the burns occurred as they were limited to her neck and up.

On January 8, 2018, claimant was treated by Dr. Pedro Vivar Cruz in Wichita for "worsening seizure activity" with four seizures including one that happened after her arrival at the clinic. *Id.* at 539. Tongue laceration and loss of bladder control were also noted. Claimant was admitted into the hospital for observation and medicated with Ativan and Keppra. Hospital records indicate that according to the claimant and her family, she had been taking her low dosage of Keppra and been seen by her primary care physician but that she had not seen Dr. Cruz since 2016. At the hospital, she was seen by other physicians, included Dr. Saad Kanaan who recorded his impression as "1. status epilepticus 2. Cryptogenic epilepsy"

and recommended continued use of Keppra, "neurochecks and seizure precautions," and "vEEG monitoring." *Id.* at 480. He also noted that "[b]ased on semiology they appear to be epileptic." *Id*. Other consultation notes indicate that seizures are "very likely epileptic" and her depression was "likely contributing to patient's poor self care." *Id*. at 476.

On January 19, 2018, claimant returned for a follow up with Dr. Cruz. He recorded that claimant lives at home with husband and daughter and receives home health care. She has difficulty remembering words and names. Her mother reported that "she is not paying attention or forgets what she is supposed to do" and that it can take her thirty minutes to get dressed. *Id*. at 524. While he was not sure if claimant's seizures were "all epileptic," Dr. Cruz imposed a "no driving" restriction for six months. *Id*. He then referred her for MRI testing and neuropsychological testing to address her memory problems.

The neuropsychological evaluation included an interview on March 22, 2018, testing on April 26, 2018, and a final session on May 10, 2018. The testing of cognition tasks identified no impairments. Robin Heinrichs, Ph.D., however, opined that "[p]sychological testing demonstrates the patient's symptoms of depression, anxiety and PTSD." *Id.* at 706. The summary includes this opinion that the claimant's "psychiatric disorders and

personality make it likely that she will appear to be unable to function independently, and she may behave in a manner that elicits assistance from others." *Id.* Thus, final impression was that claimant's cognition was intact but that she suffered from "major depressive disorder, anxiety and post traumatic stress disorder." *Id.* at 707.

In August of 2018, Dr. Cruz saw claimant who complained of two seizures on Sunday, five seizures on Monday, and numbness in face and tongue. *Id.* at 723. Claimant provided Dr. Cruz with a video of her seizure. After reviewing it, Dr. Cruz recorded it was "suggestive of pseudoseizure" and the claimant would benefit from EMU admission and from emergency care when experiencing a cluster of seizures. *Id*. at 724. Based on an EEG performed that day, Dr. Cruz noted the spike and wave discharges indicated the seizures were both epileptic and non-epileptic. *Id*. at 723.

On August 20, 2018, claimant went to the emergency room in Wichita and was admitted for recurrent seizures. *Id.* at 738. The claimant was admitted for "[g]eneralized idiopathic epilepsy, intractable, no status epilepticus" and "for continuous video EEG monitoring for seizure classification" while medication was suspended. *Id*. The monitoring occurred until her discharge on August 24, 2018, without any seizures, but with this impression on discharge, "This awake and asleep inpatient prolonged video

EEG monitoring showed generalized potentially epileptogenic abnormalities. The EEG also showed mild diffuse nonspecific background slowing." *Id*. at 749. The discharge summary included a significant finding of possible "generalized epilepsy," an "action tremor," and the adjustment of medications which increased her prescription for topiramate. *Id.* at 778.

On September 12, 2018, Dr. Cruz faxed a letter stating the following:

> My patient, [the claimant], has diagnoses that include memory loss, idiopathic epilepsy, and tremor. She is limited in daily activities and is unable to work on a sustained basis. The diagnoses have been confirmed through physical examination, medical history, EEG, and standard neurological examinations. In my opinion, Ms. Allison is unable to resume any type of gainful employment due to physical impairment.

*Id*. at 803.

On September 6, 2018, Dr.Webb saw the claimant to follow up on her August hospitalization noting the increase of seizure medication, no seizure activity since dismissal, but an increase in fibromyalgia problems. *Id.* at 815. He approved her tapering off her depression medication to alleviate headaches. *Id.* at 815. In October, Dr. Webb saw claimant who showed positive for depression, and he recommended she resume counseling. *Id.* at 861-62.

On October 24, 2018, she was seen in Wichita to follow up on

11

her seizure treatment. *Id.* at 835. Claimant reported no convulsive seizure since her discharge but occasional myoclonic jerking at night. *Id.* at 836. Claimant was told not to drive until she was seizure free for six months. *Id*. at 837. Also on the 24th, claimant saw Dr. Cruz who increased the topiramate to address chronic migraine. *Id.* at 849. Dr. Cruz continued the topiramate after seeing the claimant again in January of 2019. *Id*. at 907.

On November 6, 2018, claimant saw Dr. Webb for worsening pain from fibromyalgia, and he increased her medication. *Id.* at 859-60. In a January 2019 visit, Webb noted that the patient's seizures were doing fairly well, that her fibromyalgia had improved with the increased medication, and that her depression was stable at the time. *Id*. at 1008. All medication was continued, and counseling was strongly encouraged. *Id*. at 1009. In April of 2019, Dr. Webb saw claimant for neuropathy, short-term memory loss, and positive depression screening. *Id.* at 1010. A month later, the neuropathy had improved with increased medication, but the claimant now complained of seizures again. *Id*. at 1007. It was noted that her depression was serious and that her pain was chronic from fibromyalgia. *Id*. Dr. Webb added Cymbalta for her neuropathy and depressive disorder. *Id*. at 1008. In June of 2019, Dr.Webb followed up stopping the Cymbalta and starting amitriptyline for her neuropathy, fibromyalgia, and insomnia. *Id*. at 1005. In

12

July of 2019, claimant complained of severe fatigue and her need for a CPAP machine. *Id*. at 996-97. In September of 2019, claimant came for a referral to a dentist as she chipped her tooth after clinching her teeth from a conversion disorder following a stressful telephone call with her daughter. *Id.* at 1046. Webb also noted that claimant wanted "to discuss her employment option with her disorder" and her need for "a stress-free environment in order to be productive." *Id*. Webb's office records show that he saw claimant on October 31, 2019, spending most of the time with her filling out disability forms that she had brought. *Id.* at 1123.

On August 14, 2019, claimant was seen again at the Epileptology Clinic in Wichita by Kelli Rice APRN. Her medication was adjusted to address her increase in myoclonic events. *Id.* at 1080. Rice saw claimant again in September for increased myoclonic events, and claimant brought videos of the events that showed "body thrusting with eyes closed." *Id.* at 1061. Rice said she was comfortable diagnosing the videoed events as non-epileptic events and likely conversion disorder. *Id.* at 1062. She suggested speaking to her treating physician for more treatment options as the clinic did not treat such events. *Id*.

In October of 2019, Dr. Cruz did a follow-up examination for the claimant's chronic migraines. The claimant said the headaches had mostly

resolved when she stopped consuming pop. *Id.* at 1085*.* Cruz explained that her complaints of burning sensation were not neuropathy but likely related to her fibromyalgia. *Id.* at 1086. He noted that her mild hand tremors were psychogenic. *Id.*

Besides his treating records, Dr. Webb has filled out a seizure RFC questionnaire (*id*. at 642-44), a physical assessment (*id*. at 639-40) and a mental capacity assessment (*id.* at 636-38) on March 2, 2018. On the seizure questionnaire, he noted an average of one to three seizures monthly triggered by stress with bladder incontinence. *Id.* at 642. The claimant suffers from associated mental problems and would need to take unscheduled breaks. *Id.* at 643. Besides restricted functional limitations, Webb also opined that the claimant would need to be absent more than four times a month. *Id.* at 644. On the physical assessment, he diagnosed fibromyalgia, seizures, and conversion disorder. *Id.* at 639. He listed the same restricted functional limitations and noted that she would need to take frequent unscheduled breaks during work and would be absent from work more than four times a month. *Id*. On the mental capacity assessment, he noted moderate limitations on ability to initiate and perform a task, ability to work at appropriate and consistent pace, and ability to sustain an ordinary routine and regular attendance. *Id.* at 637. He also noted an extreme

limitation for claimant's fibromyalgia requiring more than the allotted number of rest periods. *Id*. In his office notes for March 2, 2018, Webb included the following:

> The patient reports she has not had any large seizures however she has had a lot of little ones that start either in her right arm or left leg. Today while we are filling out paperwork for her she had one in her right arm. The patient is due to see her neurologist in another month or 2. Today we spent a significant amount of time going over her disability paperwork. These were filed out with her subjective complaints.

*Id*. at 608.

On February 18, 2020, the ALJ found the claimant was not disabled despite the severe impairments of fibromyalgia, arthritis, obesity, epilepsy, asthma, anxiety, post-traumatic stress disorder, depressive disorder and conversion disorder. The ALJ relied on the neuropsychological evaluation by Heinrichs in finding that claimant's limitation in understanding, remembering, and applying information was mild. As for claimant's ability to interact, the ALJ found moderate limitation noting the results of Heinrichs' personality assessment testing but pointing to treatment records showing appropriate mood and affect. The ALJ also found a moderate limitation for concentrating, persisting, and maintaining pace while noting that claimant participated in four hours of testing by Heinrichs who found claimant to be "preoccupied with her mental and physical health" but able to understand

15

instructions "easily" and approach tasks in an organized manner. ECF# 14.

p. 21. On the ability to adapt and manage herself, the ALJ found the

claimant had reported the ability to care for herself but not to drive, but then

testified to being able to drive in town. So, while asserting disabling physical

and mental impairments, the claimant's statements were found by the ALJ to

be "not entirely consistent with the medical evidence and other evidence in

the record for the reasons explained in the decision." *Id*. at 23. On the

claimant's mental impairment, the ALJ offered this cursory summary of the

treatment records:

> In terms of mental impairments, treatment records reveal that the
> claimant is diagnosed with conversion disorder, indicating that the
> claimant's seizures are not supported by medical explanations. Indeed,
> the provider indicated that the claimant 's facial twitching was induced
> by a stressful interaction with one of her daughters (Exhibit B44F at
> 6). Dr. Heinrichs noted that the claimant's cognitive functioning was
> intact, but that the claimant was preoccupied with a physical and
> mental health (Exhibit B21F at 6). The evidence shows that the
> claimant has a history of the above mental impairments. However, the
> undersigned finds that the claimant is certainly able to perform the
> work of the type described in the above residual functional capacity
> assessment.

ECF# 14, p. 24.

The claimant's appeal challenges these findings on the medical

opinions:

> As for medical opinion(s) and prior administrative medical finding(s),
> the undersigned cannot defer or give any specific evidentiary weight,
> including controlling weight, to any prior administrative medical

finding(s) or medical opinion(s), including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings as follows: The undersigned finds that the opinions of state agency psychological consultants Charles Fantz, Ph.D. and J. Edd Bucklew, Phy.D. are persuasive because the opinions are consistent with medical evidence of record. Moreover, the undersigned notes that the claimant was able to testify coherently and the evidence shows that the claimant is able to attend doctor's appointments and communicate with her treatment providers. . . . The undersigned finds that opinions of state agency medical consultants George E. Liesmann, M.D. and John Duff, M.D. are persuasive because the opinions are consistent with the overall medical evidence of record . . . . The undersigned finds that the opinions submitted by the claimant's provider T. Scott Webb, D.O., from March 2018 are not persuasive because the statements reflect the claimant's subjective allegations, as noted in Exhibit B12F at page 8 . . . . Moreover, the opinions are not consistent with Dr. Webb's own treatment notes. The undersigned finds that the opinion of the claimant's treatment provider Pedro Vivar Cruz, M.D. is not persuasive because the opinion does not provide a residual functional capacity assessment (Exhibit B30F). Moreover, the issue of the claimant's disability is reserved to the Commissioner.

*Id.* at 25.

The claimant generally argues the insufficiency of the ALJ's stated rationale for finding that the medical opinions expressed by non-examining state agency psychological consultants and medical consultants are the only persuasive opinions consistent with the medical evidence of record. The claimant generally argues the ALJ's apparent understanding of the medical record and her longitudinal impairments is flawed.

More specifically, the claimant argues the ALJ improperly speculated that Dr. Webb's medical opinion was based only on claimant's

17

subjective complaints because of a notation found in Webb's records. As quoted above, Dr. Webb's notes from March 2, 2018, include, "Today we spent a significant amount of time going over her disability paperwork. These were filed out with her subjective complaints." *Id*. at 608. The claimant argues the ALJ erred in ignoring that Dr. Webb's signed assessments included his opinions and by speculating without clarifying whether Dr. Webb's written opinions were his patient's and not his own. The Commissioner counters that the ALJ's finding is not speculative but consistent with the notation in Dr. Webb's treatment records. The Commissioner does not see how Dr. Webb's signature "detracts" from what the ALJ inferred from his office record note. In reply, the claimant emphasizes that just before signing the physical assessment, Dr. Webb checked "yes" to this last question, "Are your patient's impairments (physical impairments plus any emotional impairments) reasonably consistent with the symptoms and functional limitations described in this evaluation?" ECF# 14, p. 640. Based on this answer in the questionnaire, the claimant argues the ALJ is speculating that Dr. Webb filled out the forms based solely on the claimant's subjective complaints without regard to the objective medical evidence of the claimant's impairments. "Where an ALJ has no legal or evidentiary basis for finding that a treating physician's opinion is based 'only

on claimant's subjective complaints,' his conclusion to that effect is mere speculation prohibited by *McGoffin v. Barnhart*." *Jackson v. Berryhill*, No. 17-1093-JAR, 2017 WL 4923347, at *4 (D. Kan. Oct. 31, 2017) (citing in part *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)). The claimant disputes the ALJ preference for relying on a notation in the treatment records while ignoring Dr. Webb's signed opinions in an assessment.

The new regulations provide for no specific or controlling weight to be given to medical opinions from a claimant's treating source. 20 C.F.R. § 404.1520c(a). Instead, all medical opinions are evaluated for persuasiveness using a uniform set of factors with the two most important factors being supportability and consistency. § 404.1520c(b). The factor of supportability means a medical opinion is "more persuasive" when it is supported by "more relevant . . . objective medical evidence." § 404.1520c(c)(1). The factor of consistency means a medical opinion is "more persuasive" when it is "more consistent" with evidence "from other medical sources and nonmedical sources." § 404.1520c(c)(2). And in determining the persuasiveness of medical opinions, the ALJ must explain the how the factors of supportability and consistency were considered. § 404.1520c(b)(2). As for the remaining three factors of relationship with the claimant, specialization, and other factors, the ALJ is not required to explain

19

how they were considered. *Id.*

It is the long-standing rule in this Circuit that, "'[t]he record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon as well as significantly probative evidence [she] rejects.'" *Janet Grace O. v. Kijakazi*, No. 20-1228-JWL, 2021 WL 3032913, at *5 (D. Kan. Jul. 19, 2021) (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996)). For that matter, it should not be assumed "a doctor naturally advocates her patient's cause or makes her assessments on the basis of advocacy." *Coles v. Berryhill*, No. 17-1187-JWL, 2018 WL 2321881, at *3 (D. Kan. May 22, 2018). There is little question that Dr. Webb's notation is some evidentiary basis for the ALJ finding that the assessments "reflect the claimant's subjective allegations." ECF# 14, p. 25. What is unique about this case is the breadth of Dr. Webb's opinions based upon his several years as the general physician treating the claimant with a complicated medical history involving fibromyalgia, seizures (apparently both epileptic and pseudoseizures), and conversion disorder. The claimant's medical records show the physicians who were treating her for the different complaints struggled to diagnose the overlapping mix of

causes behind her problems even after more testing and hospitalizations.
The neuropsychological testing in 2018 confirmed that the claimant's
cognitive functioning was not impaired but that "[h]er psychiatric disorders
and personality make it likely that she will appear to be unable to function
independently." ECF# 14, p. 713. Consistent with this, Dr. Webb's treatment
records are replete with notations not only increasing medication for her
fibromyalgia symptoms but also with advice that she resume her psychiatric
care and counseling and follow up with neurological care in Wichita for her
epilepsy. Under the unique circumstances of this case, the ALJ's unexplained
reference to a candid notation in Dr. Webb's treatment records is not a
logical bridge for inferring that Dr. Webb was not credible in answering and
signing what he represented to be his medical opinions on the claimant's
limitations. For example, Dr. Webb checked and signed as his "estimate"
that the claimant would be absent from work "more than four times a
month" based upon his "experience with the patient, and based upon
objective medical, clinical and laboratory findings." ECF# 14 at pp. 640, 644.
Dr. Webb further opined that the claimant's impairments are "reasonably
consistent with the symptoms and functional limitations described in this
evaluation." ECF# 14 at p. 640. Based on the unique circumstances of this
case, the court agrees with the claimant that the ALJ resorted to speculation

in summarily rejecting all of Dr. Webb's opinions stated in the assessments, particularly those where he expressly affirmed that they were based upon objective medical findings. Thus, the ALJ has failed to explain how she considered the supportability of Dr. Webb's stated opinions expressly based on objective medical findings.

Besides this speculative and unexplained rationale for evaluating supportability, the ALJ's finding on Dr. Webb's opinions is further weakened by the conclusory and unexplained finding that his "opinions are not consistent with [his] . . . own treatment notes." ECF# 14, at p. 25. The decision fails to identify which opinions and treatment records support this finding. The Commissioner has attempted to fill in the blanks by guessing about which of Dr. Webb's opinions and treatment notes that the ALJ was referencing. Even so, this does not overcome a more serious deficiency in the ALJ's findings. As the claimant argues, the ALJ has failed to evaluate the consistency of Dr. Webb's medical opinion on limitations due to the seizure disorder with the relevant treatment notes from other medical sources. As already summarized above, the medical record is replete with other sources' records showing multiple seizure episodes and types, physical manifestations witnessed through broken tooth and tongue lacerations, hospitalizations, testing, recurrent myoclonic episodes, and increased levels of prescribed

22

medications. The court agrees with the claimant that the revised regulations would have the ALJ explain how she considered the consistency between Dr. Webb's opinion and these other medical sources. The ALJ did not provide this explanation, and a court may not create a post-hoc rationale to support the ALJ's decision. *See Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007). The ALJ has not provided an explanation that allows for proper meaningful review of her conclusions on this medical opinion evidence.

The claimant further contends the ALJ erred in finding that the state agency consultants' opinions were consistent with the medical evidence of record. The claimant highlights that a consulting physician reported that the claimant's seizure order had "improved significant[ly]" after her August 2018 hospitalization. ECF# 14, p. 132. The claimant argues the medical evidence is to the contrary showing that her seizure activity continued, that she broke her tooth during a myoclonic episode, and that her seizure medication was increased to address the clusters of myoclonic episodes. All of which the medical record establishes. The claimant also contends the ALJ's analysis mischaracterizes the evidence and includes misleading findings such as, that she "had a history of approximately one year where she remain 'seizure free.'" ECF# 14, p. 23. For this seizure-free finding, the ALJ cites a treatment record of Dr. Vivar Cruz from October 2016 without

explaining how this observation made before the disability onset date bears on the medical treatment given during the relevant period which included hospitalization, more testing, and increased medication for her seizures. The court agrees that the ALJ's decision in discussing the medical opinions on the claimant's seizure disorder and impairment utterly fails to show how she considered the supportability and consistency of the consulting opinions against the actual medical records of the claimant's care and treatment. Though the revised regulations have abolished the treating physician rule and have put the focus on the content of the medical opinions and less on the relationships, they still demand that the ALJ "provide a coherent explanation of his reasoning" and "build an accurate and logical bridge from the evidence to" the evaluations given the different medical opinions. *Blackmon v. Commissioner*, No. 20-1196, 2021 WL 2744656, at *10 (N.D. Ohio Jul. 1, 2021). Having failed to do so, the ALJ's decision is vacated and remanded for further consideration consistent with this order.

IT IS THEREFORE ORDERED that the judgment be entered in accordance with sentence four of 42 U.S.C. § 405(g) reversing the Commissioner's final decision and remanding this case for further consideration.

Dated this  19th day of August, 2021, Topeka, Kansas.

24

 /s Sam A. Crow
Sam A. Crow, U.S. District Senior Judge